IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CHESTER BRIGGS | : | |
| | : | CA No. 06-528S |
| vs. | : | |
| | : | |
| A.T. WALL | : | |

**PETITIONER'S OBJECTION TO STATE OF RHODE ISLAND'S MOTION TO DISMISS PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Petitioner hereby objects to the state's motion to dismiss his petition for writ of habeas corpus. The petition states claims for relief under 28 U.S.C. § 2254 which preclude summary disposition of this matter. Petitioner states his reasons more fully in the accompanying memorandum.

Respectfully submitted,
Chester Briggs
By his attorneys,

/s/ John A. MacFadyen

JOHN A. MACFADYEN, ESQ. (#1209)
C. LEONARD O'BRIEN, ESQ. (#1886)
MacFadyen, Gescheidt & O'Brien
101 Dyer Street
Providence, RI 02903
401-751-5090

**CERTIFICATION**

I hereby certify that on the 25th day of May, 2007, I filed the foregoing Objection electronically and that it is available for viewing and downloading from the ECF system. Service was accomplished by transmission of the Notice of Electronic Filing generated by the ECF system to the following attorney(s) of record:

Jane M. McSoley
Assistant Attorney General
150 South Main Street
Providence, RI 02903
jmcsoley@riag.ri.gov

/s/ John A. MacFadyen

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CHESTER BRIGGS | : | |
| | : | CA No. 06-528S |
| vs. | : | |
| | : | |
| A.T. WALL | : | |

**PETITIONER'S MEMORANDUM IN SUPPORT OF OBJECTION TO STATE OF RHODE ISLAND'S MOTION TO DISMISS**

## I. INTRODUCTION

Petitioner, Chester Briggs, has filed a *pro se* application for writ of habeas corpus under 18 U.S.C. § 2254. He claims that the State of Rhode Island failed to disclose exculpatory evidence regarding its lead witness, one Timothy Ayers, which was material, indeed critical, to any reasoned assessment of petitioner's guilt or innocence. In preference to filing an answer to this claim, the state has filed a motion to dismiss. The motion itself states no grounds. The accompanying memorandum asserts that, given the determination of facts during the state proceedings, the evidence at issue was not material under the test enunciated in *United States v. Bagley,* 473 U.S. 667 (1985). *State of Rhode Island's Memorandum in Support of its Motion to Dismiss Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Memorandum)* at 7-8. The state makes no argument (nor could it) that the suppressed information was not within the state's possession. Further, the state concedes that the petitioner has exhausted his state remedies on the claims presented in the petition. *Id.* at 6 n. 3.

Timothy Ayers took the witness stand at Mr. Briggs's trial and claimed to have received jailhouse confidences which convicted petitioner out of his own mouth. He disarmed cross-examination with the apparently candid acknowledgement that he had used Mr. Briggs's admissions to bargain for his liberty just one time with the state. But that was not the truth. In

fact, Mr. Ayers had an ongoing relationship with the police such that he could continue to live a life of crime so long as he continued to deliver the goods on fellow criminals. He was a purveyor of jailhouse confessions, not just a happenstance recipient. These goods were shoddy at best, but the state never looked very closely. Instead, Ayers was offered a cooperation agreement under the aegis of which he continued to offend with impunity. If Mr. Briggs's jurors had known what counsel learned only after the verdict, then they likely would have rejected Ayers's apparently damning testimony out of hand. As the state, however, suppressed this information, the jury never had the opportunity to make its assessments on the basis of all the facts.

When evidence of Ayers's true history spilled out after the verdict, the trial court limited the inquiry at the behest of the state. It barred examination into the overall relationship between Ayers and the state, crediting the state's claim of an informant's privilege. Further, it assessed the exculpatory information, not from the vantage demanded by *Brady* and its progeny— *i.e.,* based on the impact the information might have had after full development and exploitation by counsel—but, instead, by what was apparent to the state before and during trial. This legal error led the state courts into a begrudging assessment of the litigational value of the exculpatory information. Further, it caused the trial court to confuse the *Brady* inquiry with the scope of Rule 16 discovery under the Superior Court Rules of Criminal Procedure. And, finally, these *Brady* violations were cabined with a series of discovery defaults so gross as to implicate the Due Process Clause.

Petitioner will first outline the travel of this litigation, followed by a recitation of the relevant legal standards, and concluding with an outline of the multiple ways in which the state court proceedings were both contrary to, and involved an unreasonable application of,

established law and were premised upon an unreasonable determination of facts in light of the evidence presented. *See,* 28 U.S.C. § 2254(d)(1)(2). In these circumstances, the state's non-disclosure of exculpatory information in its possession is "sufficient to undermine confidence in the outcome," thereby establishing constitutional error. *Bagley, supra* at 682.

## II. BACKGROUND OF CASE

### A. In General

On the evening of February 19, 1997, Patricia Jacques was shot to death near the stables at her home in Tiverton, Rhode Island.[1] The ensuing investigation produced information that Mr. Briggs had a long-term relationship with the decedent, that he owed her substantial sums of money, that he was in Rhode Island on the night of the murder, and that he had previously obtained a handgun of a type which was not inconsistent with the shell casings found at the scene. *Id.*[2] In short, the state had a classic circumstantial case: motive, means and opportunity. The capstone of the state's case, however, was Timothy Ayers (a/k/a Timothy Scott Provencal). Ayers was an inmate at the Adult Correctional Institutions (ACI) who was housed in the same mod with Chester Briggs during the spring of 1997, when Briggs was brought to Rhode Island on a complaint charging him with murder.

Ayers was (and is) a drug addict and career criminal, with more than a score of contacts with the law. In the spring of 1997, he had been arrested for breaking and entering and was being held as a violator on several suspended sentences. In early March, Ayers wrote a letter to the Attorney General, seeking to trade information about various theft crimes in exchange for a

---

[1] This broad outline of facts is taken from the opinion of the Supreme Court of Rhode Island in *State v. Briggs,* 886 A.2d 735, 742-744 (R.I. 2005).

[2] Several of these predicates were substantially challenged by the defense at trial, including the claim by a gas station attendant that he had seen Briggs in Tiverton on February 19, 1997 (as opposed to the preceding evening), and the evidence relating to Briggs's acquisition of a handgun.

reduced sentence. Letter included as *Appendix (App.) A*. This letter was followed by another, received by the Attorney General on May 2, 1997, in which Ayers offered to help convict Chester Briggs. Letter included as *App. B*. After several sessions with various members of law enforcement, Ayers emerged as a central witness with a full-fledged jailhouse confession replete with multiple details regarding the Jacques murder. *See,* Randall Statement of May 5, 1997 (*App. C*); Croce Statement of May 7, 1997 (*App. D*); and Tella Statement of May 28, 1997 (*App. E*). He signed a cooperation agreement with the state on June 2, 1997, in which he agreed to testify against Mr. Briggs in return for the recommendation of a minimal sentence on his pending charge and a continuation of his probation. *Memorandum of Agreement,* included at *App. F*.

**B. Legal Proceedings**

Mr. Briggs was indicted for murder on September 25, 1977. *Indictment* included as *App. G*. Counsel for Mr. Briggs, John F. Cicilline, Esq., filed the standard discovery request under R.I.Super.R.Crim.P. 16 (request attached as *App. H*), together with a motion for exculpatory evidence (motion attached as *App. I*). Where Ayers was concerned, the state responded to these motions by furnishing the defense with the Randall, Croce and Tella statements (discovery response attached as *App. J*), supplemented by the *Memorandum of Agreement* and Ayers's testimony at Briggs's bail hearing. In addition, the state provided a printout from the Bureau of Criminal Identification (BCI 1) listing Ayers's prior record. BCI 1 attached as *App. K*.

The case initially came to trial in the spring of 1998 before Dimitri, J., sitting in Newport. After a lengthy hearing, Judge Dimitri found that the police had overborne Mr. Briggs's will during some thirteen straight hours of questioning, rendering his statements involuntary.[3] The state took an appeal, and the Supreme Court of Rhode Island reversed the suppression order in

[3] This statement was not a confession. To the contrary, Briggs denied his involvement in the Jacques murder no fewer than 72 times. The state, however, found some value in certain specific answers which it could attack as inaccurate.

part. *State v. Briggs,* 756 A.2d 731 (R.I. 2000) (*Briggs I*). In essence, the Court allowed the state to introduce the first half of Briggs's statement on the theory that the real police misconduct began only partway through the marathon interrogation session. *Id.* at 738-739.

The case finally opened to a jury on March 19, 2001. Ayers took the witness stand on April 10, 2001. Ayers's trial testimony of 4/10/01 is attached as *App. L*; Ayers's trial testimony of 4/11/01 is attached as *App. M.* An updated BCI was given to the defense shortly prior to his testimony. *App. W*:76. BCI 2 included as *App. N*. This BCI revealed that Ayers had three additional convictions since the time of the first BCI (and since the time he had entered a cooperation agreement with the state requiring that he not violate the law).

The state opened Ayers's direct examination by having him acknowledge his criminal past, and in particular, two of his recent offenses. *App. L*:170-171. Ayers then described meeting Chester Briggs in J Mod at the ACI Intake Center, *id.* at 172, and launched into a description of how Briggs admitted to him that he had murdered Patricia Jacques because he owed her money and he did not have it. *Id.* at 179 *et seq*. His testimony closed with a description of his letter contacts with the Attorney General and his meetings with various investigators. *Id.* at 208 *et seq.* Lastly, he described the cooperation agreement he had signed on June 2, 1997. *Id.* at 211-216.

On cross-examination, defense counsel hammered away at Ayers's cocaine addiction and the fact that he violated his cooperation agreement but was not required to go back to jail. *App. L*:218 *et seq*. He was also queried about the benefit he had received for his testimony. *App. M*:46-47. Ayers claimed the cooperation agreement was the sum total of his bargain with the state and that he was not expecting anything currently. *Id.* at 47. Lacking any further basis for impeaching Mr. Ayers, the bulk of the defense cross-examination focused on the details of

various statements he had given to law enforcement personnel. *App. L*:246 *et seq.*; *App. M*:27 *et seq*.

The jury returned a verdict of guilty of murder in the first degree on April 20, 2001. The defense waived the filing of a motion for new trial, and Mr. Briggs was sentenced to the mandatory penalty of life imprisonment on April 27, 2001.

**C. <u>Post-verdict Proceedings</u>**

Just six days after the jury's verdict and one day prior to the defendant's sentencing, the state filed supplemental discovery in another criminal case: *State v. Fuller,* W1-1999-0311A. This response unveiled Ayers in a new role: the alleged recipient of a jailhouse confession from Mr. Fuller in circumstances strikingly similar to his Briggs evidence. Discovery attached as *App. O*.

This information had not been newly received by the Attorney General. To the contrary, the record established, and indeed the state stipulated, that Ayers had given a statement to Detective John A'Vant of the State Police detailing the alleged Fuller confession back on October 21, 1999, nearly two years earlier. Stipulation attached as *App. P*; Statement attached as *App. Q*. For a year and a half this information sat in the state's files, undisclosed to either Fuller or Briggs. Nor was it an instance of the right hand not knowing what the left was doing. The prosecutor in the Fuller case, and the prosecutor in the Briggs, case, were one and the same person.

After the supplemental *Fuller* discovery was finally provided, Fuller's counsel, John MacDonald, Esq., of the Office of the Public Defender, sent an investigator, James Abbott, out to interview Timothy Ayers. Report of 5/7/01 included at *App. R*. According to the investigator, Ayers told him "that the statements he made to the state police were untrue and inaccurate." *Id.* They "were stories he heard other inmates say." *Id.*

On receiving Abbott's report and recognizing Ayers's name from the highly publicized Briggs case, counsel for Fuller passed the information along to Mr. Cicilline. On May 30, Briggs filed a post-verdict motion for new trial, alleging, among other things, a violation of the rule in *Brady v. Maryland,* 373 U.S. 83 (1963). Motion attached as *App. S.* This motion was followed by an addendum asserting that the defense had recently learned that Ayers had been cooperating against his co-defendant in yet another case, *State v. Beverly,* P2-2000-3556(B). *Addendum* attached as *App. T.*

The state responded to this motion by claiming that it had no obligation under *Brady* or otherwise "to provide the defendant with details of Timothy Ayers's role as a witness in unrelated cases." *State's Memorandum in Support of Its Objection to Defendant's Motion For New Trial* at 2. The state further claimed that the information regarding Ayers's cooperation would have been inadmissible, thereby eliminating any disclosure obligation. *Id.* at 4.

Then came a third revelation. The state had failed to disclose three additional crimes committed by Ayers, all occurring and prosecuted after Ayers had signed his cooperation and had promised to stay on the straight and narrow. State records included as *App. U.* All tolled, state records now showed that Ayers had committed the following offenses and obtained the following dispositions in the time between his agreement to give testimony against Mr. Briggs and the time of trial:

- Info. No. 1998-0382A
  Fraudulent Use of Credit Cards
  Offense Date: 12/15/97
  Disposition Date: 4/23/98
  Sentence: No jail term to serve, 3 years
  suspended sentence, 3 years probation

- Info. No. 1998-2361A
  B&E (Hill Office Supply)
  Offense Date: 5/8/98
  Disposition Date: 9/22/98
  Sentence: No jail term to serve, 7 years
  suspended sentence, 7 years probation

- Info. No. 1999-0928A
  B-E Bldg Nt w/Int Larc (Salvation Army)
  Offense Date: 12/5/98
  Disposition Date: 4/8/99
  Sentence: 5 months jail term to serve,
  2 years 7 months suspended sentence

- Info. No. 1999-0524A
  Receiving Stolen Goods Over $800 (Ebeling's Auto)
  Offense Date: 12/23/98
  Disposition Date: 3/9/99
  Sentence: 6 months jail term to serve,
  4 ½ years suspended sentence

- Info. No. 1999-3387A
  B-E Bldg Nt w/Int Larc (Clockwork Deli)
  Offense Date: 8/21/99
  Disposition Date: 9/30/99
  Sentence: 90 days jail term to serve,
  5 years 9 months suspended sentence

- Info. No. 2000-3556A
  B-E Bldg Nt w/Felony Intent (Sam's Fuel and Food)
  Offense Date: 6/22/00
  Disposition Date: 12/12/00
  Sentence: 1 year jail term to serve,
  9 years suspended sentence

In each instance, the offense was committed while Ayers was on probation for one or more previous offenses. Notices of violation under R.I.Super.R.Crim.P. 32(f) were filed, but somehow Ayers was allowed to continue on his probations. The net result was that when Ayers testified at trial in April of 2001, six felony offenses later, he had a release date in just a month's time. *App. M*:48. The state's only explanation was to present an affidavit from the line

prosecutor in the *Beverly* case asserting that he negotiated the disposition without regard to the provision of testimony. *Affidavit* included at *App. V*.

The trial court held a hearing on the post-verdict challenge on November 6, 2001. Transcript included as *App. W*. Four persons were called by the defense: Ayers, a court clerk (to certify Ayers's record of convictions), the investigator, James Abbott, and the prosecutor who had disposed of the *Beverly* case. Ayers asserted that he did not expect anything in return for supplying the information regarding Fuller. *App. W*:8. He explained his statements to Abbott by claiming that he had repeated accurately to the police what Fuller had told him, but had since learned that Fuller was not telling the truth. *Id.* at 12. And he claimed that he had received the information directly from Fuller. *Id.* When the defense sought to move outside of the specific Fuller/Beverly context, the Attorney General objected. *Id.* at 14. The defense argued that it was entitled to learn how often and when Ayers had generated information in order to shorten his stay in prison. *Id.* at 15-16. The state's objection was sustained. *Id.* at 16-17.

Ayers went on to deny receiving any promises, rewards or inducements for his testimony in *Briggs,* with the exception of his original cooperation agreement negotiated back in 1997. *App. W*:17-18. As the defense started running over Ayers's dispositions, the state began objecting, claiming that the defense was just rehashing old ground. *Id.* at 19-26. The court allowed the defense to ask questions about the specific offenses Ayers committed in the 1997-2000 time frame, overruling state objections that the testimony should be limited explicitly to Fuller and Beverly. *Id.* at 31-32, 34-37. In between these objections, Ayers conceded that he had spoken with Detective A'Vant a number of times, possibly five, *id.* at 32, 38, but he continued to deny that he was receiving anything back for his cooperation. *Id.* at 33. Finally, Ayers conceded that, while he was not asking A'Vant for leniency based on his cooperation,

A'Vant knew he had helped the state, *id.* at 41, and it was possible that A'Vant was instrumental in getting him favorable treatment. *Id.* at 42. At that point the state again objected, arguing that the defense was on a "fishing expedition," insofar as the questions were going beyond Fuller and Beverly, and that any further information regarding Ayers would fall under the "informant privilege." *Id.* at 43. The court sustained the objection. *Id*.

James Abbott then testified and described his interview of Ayers. He reiterated that Ayers had told him that what he (Ayers) had said to the state police about Fuller was not true. *App. W*:55. Further, he reaffirmed Ayers's admission that "he took that information that he heard from other inmates and made it his story and that's what he told the state police." *Id*.

Lastly, Assistant Attorney General David Prior testified regarding the affidavit he had previously filed. He reiterated that he had entered Ayers's disposition in the *Beverly* case without regard to Ayers as a possible witness against Beverly or Briggs. *App. W*:65-66. He could not remember how it was that he agreed to such a lenient sentence given Ayers's lengthy criminal history. *Id.* at 63-66.

Following the hearing, in January of 2002, the defense received a letter from another inmate, one Robert R. Brophy. *App. Z*:5. Letter included at *App. X*. Brophy had been Ayers's roommate at the ACI in late 2000 and early 2001. According to the letter, Ayers admitted to Brophy that Briggs had never given him information about his case. Instead, the details came from the state police. *Id.* Brophy also reported that Ayers had admitted giving information against Richard Beverly on a series of Breaking & Enterings which allowed him to obtain only a one-year sentence, while Beverly received seven and a half years to serve. *Id.*

Brophy reaffirmed the content of his January 2001 statement in an interview with a private investigator on June 7, 2002. Report included at *App. Y*. The defense called Brophy to

testify on June 11, 2002. Transcript included as *App. Z*. He asserted his Fifth Amendment privilege, complaining that he was worried that cooperation with the defense would cause the state to retaliate. *App. Z*:4-5. The court referred Brophy to an attorney for consultation, *id.* at 6-7, and his testimony was never resumed.

**D. Post-verdict Decision**

On January 16, 2003, the Superior Court issued a written decision denying Mr. Briggs's post-verdict motion. *State v. Briggs,* 2003 R.I. Super. LEXIS 12 (*Briggs II*). The court recited the standard of materiality developed in *Bagley*. *Id.* at *13. But it went on to conclude that the state had no obligation to produce any information outside of the prior convictions of a prosecution witness. *Id.* at *13, *22. Having thus limited the prosecutorial obligation, the court then concluded that neither the Fuller jailhouse confession, nor Ayers's three additional post-verdict convictions, were sufficiently significant to warrant a new trial. *Id.* at *19, *22-23. Along the way, the trial court accepted Ayers's explanation of the statement to the investigator Abbott: that what Ayers meant was that he understood in hindsight that Fuller's information was false, not that he (Ayers) deliberately falsified the information to the police. *Id.* at *2. The court never assessed the real import of Abbott's testimony. In particular, it never addressed the critical point that Ayers had conceded to Abbott that he did not receive his incriminating information directly from Fuller. Nor did the trial court reach the broader question of Ayers's overall relationship with the state, instead treating both the Fuller jailhouse confession and the three additional convictions as separate and isolated facts.[4]

---

[4] The precise basis for the trial court's finding of non-materiality is somewhat obscure. In the context of deciding Briggs's motion for a new trial based on newly discovered evidence (a state law claim), the court did outline the overall evidence against Briggs. *Briggs II, supra* at *8 n. 2. On the other hand, its materiality decision on the constitutional claim was substantially premised upon its belief that the *Fuller* information, as understood at the time, was of marginal

**E. <u>The Appeal</u>**

On appeal, Briggs presented a plethora of claims of error to the Supreme Court of Rhode Island. Among them was an argument that the trial court improperly denied the post-verdict motion both on state law grounds and under *Brady v. Maryland*. Excerpt of Defendant's Brief attached as *App. AA*. The brief claimed that "[t]he pattern employed by Ayers would have undermined his credibility, particularly when it is connected to the lenient dispositions he earned." *Id.* at 66.

The Supreme Court of Rhode Island upheld the denial of Briggs's *Brady* motion. *State v. Briggs,* 886 A.2d 735 (R.I. 2005) (*Briggs III*). Intertwining its analysis of the *Brady* issue with state standards on newly-discovered evidence, the Court concluded that neither the Fuller jailhouse confession, nor the three additional convictions, were sufficiently material to warrant a new trial, given the fact that the defense was able to cross-examine Ayers at substantial length over his efforts to cooperate with the state in exchange for favorable treatment. *Id.* at 758-759. Like the trial court, the appellate court never addressed the broader question of Ayers's overall relationship with the state. Nor did it address the testimony from Abbott that Ayers had conceded that the alleged Fuller jailhouse confession was actually cobbled together from information given to him by other inmates. Lastly, the court did not premise its conclusion of non-materiality on the strength of the state's overall case against Mr. Briggs. Instead, it concluded that the defense had adequate tools to cross-examine Ayers, and that the new information would not have altered the result of this examination. *Id.* at 757-758.

---

significance, and that the three additional convictions would have added little to the impeachment of Ayers. *Id.* at *18-23.

**F. Federal Petition**

On December 5, 2006, Mr. Briggs filed a *pro se* petition under 28 U.S.C. § 2254, asserting, among other things, a violation of *Brady v. Maryland* and the Due Process Clause. This petition was filed within the time frame required by 28 U.S.C. § 2244(d)(1). On preliminary review under Rule 4 of the *Rules Governing Section 2254 Cases in the United States District Courts*, this Court did not dismiss the petition and instead ordered the Attorney General to file a response. *Order* of December 6, 2006. The state filed its motion to dismiss on January 3, 2007. In discussing the *Brady* claim, the state stresses the presumption of correctness which federal courts must give to state court fact-finding under 28 U.S.C. § 2254(e)(1). *Memorandum* at 7. And it argues that there was no clear error in the state court's conclusions that the *Fuller* information and Ayers's additional convictions were not material under the *Bagley* standard. *Id.* at 8-9.

Mr. Briggs retained counsel to represent him on February 14, 2007. Although the *pro se* petition states multiple possible bases for relief, counsel have winnowed the list down to the Ayers situation and related Due Process violations.[5]

## III. STANDARD OF REVIEW

The state has elected not to file an answer to the petition. Instead, it has come back with a motion to dismiss, asserting that the state courts' fact-finding must be presumed to be correct and, in that context, the state's failure to disclose the Fuller jailhouse confession and the three additional convictions was immaterial under the standard set by the Supreme Court of the United States.

A motion to dismiss a petition filed under § 2254 should not be granted unless this Court can say, "without examination of the trial transcript, . . . that petitioner necessarily will be unable

---

[5] *See,* p. 30 *infra,* outlining additional Due Process claims.

to establish a constitutional violation." *Moran v. Vose,* 816 F.2d 35, 36 (1st Cir. 1987). *Pro se* pleadings must be construed liberally. *E.g., LaRue v. Coplan,* 207 U.S. Dist. LEXIS 32490 (D.N.H.), citing *Ayala Serrano v. Labron Gonzalez,* 909 F.2d 8, 15 (1st Cir. 1990). The standard for summary dismissal of a § 2254 petition is the one ordinarily applied to Rule 12(b)(6) motions. *LaRue, supra*. A complaint may be dismissed "'only if it is transparently clear that the complaint, in light of the facts alleged, engenders no viable theory of liability.'" *Redondo-Borge v. United States HUD,* 421 F.3d 1, 5 (1st Cir. 2005), quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio,* 406 F.3d 1, 6 (1st Cir. 2005).

Judged by these standards, summary dismissal of Mr. Briggs's petition would be improper. No reasoned assessment of the state's claim of immateriality can be made without a review of the relevant portions of the record. *Brady* claims are inherently fact-based. Materiality arguments by their very nature demand an understanding of the case as a whole.

In the sections that follow, petitioner will list the standards for relief under § 2254 and will then outline the nature of the extraordinary Due Process problems which infected the prosecution of this case and undermine confidence in the justice of its verdict.

## IV. 28 U.S.C. § 2254: BASIC REQUIREMENTS

Section 2254 of Title 28 authorizes this Court to grant an application for writ of habeas corpus under any of three circumstances:

- Where the decision was contrary to established Supreme Court law (28 U.S.C. § 2254(d)(1));
- Where it involved an unreasonable application of established Supreme Court law (*id.*);
- Where the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding (28 U.S.C. § 2254(d)(2)).

The first of these standards covers the situation in which a state court has arrived at a conclusion "opposite to that reached by [the Supreme Court] on a question of law . . . ." *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000). The second envisions a situation where the state decision is erroneous *and* includes "'some increment of incorrectness beyond error' . . . great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir. *en banc* 2002), quoting *Frances S. v. Stone,* 221 F.3d 100, 111 (2nd Cir. 2000). Two examples of such an increment are state court decisions which are "devoid of record support for its conclusions or [are] arbitrary." *Id.* at 37.

As for the final ground, "an unreasonable determination of the facts," 28 U.S.C. § 2254(e)(1) gives a presumption of correctness to state court fact-finding which can be overcome by clear and convincing evidence. A court will not infer the existence of a state court finding of fact if the record fails to show that the state court ever considered the point at issue. *Norton v. Spencer,* 351 F.3d 1, 6-7 (1st Cir. 2003). In such an instance, the factual conclusion is not "'fairly supported by the record'" and therefore constitutes an "unreasonable determination of the facts" under § 2254(d)(2). *Norton, supra* at 6, quoting *Marshall v. Lonberger,* 459 U.S. 422 (1983).

A different standard applies when an issue has been presented to the state courts, but has been left unresolved. In such circumstances, this Court will review the constitutional claim *de novo*. *Lynch v. Ficco,* 438 F.3d 35, 44 (1st Cir. 2006), *cert. denied,* 2006 U.S. LEXIS 5442; *Fontini v. Murphy,* 257 F.3d 39, 47 (1st Cir. 2001), *cert. denied,* 535 U.S. 1018 (2002).

## V. GROUNDS FOR RELIEF

### A. Rulings Contrary to Supreme Court Law

#### 1. Basic Principles

The rule announced in *Brady v. Maryland,* 373 U.S. 83 (1963) is inherently retrospective. The Due Process Clause will require reversal of a conviction when the state failed to disclose exculpatory evidence in its possession which "is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution." *Id.* at 87.

Thus, *Brady* courts do not sit to assess fault. Since the *Bagley* decision (if not before), the Supreme Court has made clear that the issue is not what an individual prosecutor should or should not have known about the quality of the information in the state's possession. Instead, the elements are just three:

> The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.
>
> *Strickler v. Greene,* 527 U.S. 263, 281-282 (1999).

Regarding the last component, the Supreme Court has disavowed any distinctions premised upon whether or not the prosecution failed to respond to a defense request for the specific information. *Kyles v. Whitley,* 514 U.S. 419, 433 (1995); *Bagley, supra* at 682. The issue is not what the prosecution knew or should have known given the presence or absence of defense requests, but simply the functional issue of whether, in retrospect, the non-disclosure was of sufficient significance to "undermine[s] 'confidence in the outcome of the trial.'" *Kyles, supra* at 434, quoting *Bagley, supra* at 678.

Here, the fact that Ayers was cooperating with the state in another case was clearly exculpatory, regardless of whether the information he was providing was true or false. *E.g., United States v. Cole,* 707 F.Supp. 999, 1003 (N.D. Ill. 1989) ("After all, a history of cooperation with the government would tend to impeach the credibility of a government witness"). *See also, United States v. Dominguez,* 131 F.R.D. (N.D. Ill. 1990) (same).

The *Brady* question, however, is whether it was material in the sense that the non-disclosure "undermines confidence in the verdict." *Kyles, supra* at 434. On this issue, a court must look to the full import of the information as assessed from the post-trial vantage. Here, that information included the fact that Ayers had conceded to a reputable witness (Investigator James Abbott) that he was flogging second-hand information and not simply that he was cooperating with the state in another case. Put another way, if the defense had been told before trial of Ayers's cooperation in *Fuller,* it could have exploited that information to learn what Abbott learned only after the verdict. *Cf., Ellsworth v. Worden,* 331 F.3d 1, 5 (1st Cir. 2003) (*Brady* encompasses "lead[s] to strong exculpatory evidence").

The state courts used and then abused these principles to whipsaw the *Fuller* information into insignificance. On the one hand, they took the position that, because *Brady* is not a rule of discovery, the exculpatory nature of the information will not require its disclosure unless otherwise compelled by R.I.Super.R.Crim.P. 16. On the other, they held that the prosecution could not be charged with a *Brady* violation when it could not foresee its full exculpatory import, which became apparent only after trial.

Thus, in its written decision, the Superior Court justified the state's non-disclosure of Ayers's second jailhouse confession by citing to Rhode Island precedents for the proposition "that despite the defendant's entreaty that the court be guided by the mandate in *United States v.*

*Cole* concerning a witness's prior court appearances, the Rhode Island Supreme Court's interpretation of Rule 16 in *State v. Brown* [that pre-trial discovery is limited to prior convictions] is 'clear and controlling.'" *Briggs II* at *15, citing *Fuller,* 2000 R.I. Super.LEXIS 98.[6] Reasoning that if Ayers's activities relating to *Fuller* were "not of an obviously exculpatory character," *id.* at *18, the prosecutors had no obligation to disclose the information under *Brady*, notwithstanding the later revelations from the Public Defender's investigator, James Abbott. *Id.* at *15, citing *State v. Brown,* 709 A.2d 465 (R.I. 1998) and *Fuller, supra*.

The Supreme Court of Rhode Island endorsed this error when it premised its *Brady* analysis on the fact that the record did not show that the state was aware that Ayers had withdrawn his *Fuller* statement prior to the time the jury reached its verdict. *Briggs III*, *supra* at 758 n. 12. From the Court's perspective, the issue was what the prosecutors knew at the time, not what could have been developed by the defense if disclosure had been made.

In sum, according to the state courts, because *Brady* looks backward, it is not a rule of discovery mandating pre-trial disclosure. At the same time, the prosecutor's retrospective obligation under the Due Process Clause will be measured exclusively by what s/he understood looking forward at the time of trial. This reasoning led to the remarkable proposition at the heart of *Briggs II* that there can be no violation of the *Brady* rule unless pre-trial disclosure was mandated under state discovery rules. *Briggs II* at *15, citing *Brown, supra* and *Fuller, supra*.

This reasoning stands *Brady* on its head. Effectively, it announces a new rule of federal constitutional law. Under *Brady,* the focus should have been on the total relationship between

---

[6] Ironically, the major state court decision relied upon by the *Briggs* trial court was a rescript opinion entered in Fuller's case, where the prosecution took the same aggressive attitude toward disclosure of its informants' relationship with the police. In that case, the prosecution succeeded in persuading the Superior Court that it had no obligation to disclose the nature and extent of its witnesses' ongoing cooperation with law enforcement in a pre-trial context because *Brady* "provide[s] a post-trial remedy that is not applicable to pretrial discovery." *Fuller, supra* at *5.

the state and Ayers in all its aspects. This included not simply the fact of the *Fuller* and *Beverly* cooperations, but Ayers's ongoing criminality and his license to offend again and again without receiving commensurate jail time. Indisputably, this information was exculpatory and it was within the possession of the state. The only remaining issue was materiality. And on this point the prosecution should not have been heard to defend on the ground that it did not understand the full import of the information it failed to disclose. Yet this is what *Briggs II* and *Briggs III* hold.[7]

The position taken by the state courts is "contrary to, . . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), as stated in *Brady* and its progeny.

2. Standard for Materiality

The state courts committed a second fundamental constitutional error when they drew a standard for materiality from previous Rhode Island precedent and not from the standard enunciated by the Supreme Court in *Kyles, supra*. In *Bagley, supra* at 682, the Supreme Court had observed that exculpatory information would be deemed material in a constitutional sense "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Later, in *Kyles, supra* at 434, the Supreme Court cautioned that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal

---

[7] One explanation of the erroneous approach to *Brady* taken by the Rhode Island court lies in the continuing vitality under Rhode Island law of a fault-based approach to the non-disclosure of exculpatory evidence. Rhode Island adopted a multi-tiered standard for materiality back in 1975, prior to the *Bagley* decision, when many courts believed this was required by *Brady*. *See, In Re Ouimette,* 115 R.I. 169, 342 A.2d 250 (1975). This approach was rejected in *Bagley* and the Supreme Court decisions that followed, but Rhode Island continues to use it. *See, Briggs III, supra* at 759; *Briggs II, supra* at *13. By intertwining its state and federal analyses, the *Briggs* courts applied an outmoded and erroneous legal standard to the federal constitutional problem before them.

(whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." It stressed the importance of the adjective in *Bagley*'s phrase, a "*reasonable* probability of a different result." *Id.* (emphasis supplied). Thus, under *Kyles,* the question is "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* "'A reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.*, quoting *Bagley, supra* at 678.

The Superior Court referenced the *Bagley* standard, *Briggs II, supra* at *13, but then segued into a different and constitutionally erroneous standard premised on prior Rhode Island decisions. Thus, when it came to decide the materiality issue, the Superior Court held that "the Defendant must show that there would be a significant chance that the use and development of the evidence discovered post-trial would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Id.* at *19, citing *Mastracchio v. Moran,* 698 A.2d 706, 719 (1997), applying Rhode Island's "significant chance" rule originally developed in *In Re Ouimette,* 115 R.I. 169, 342 A.2d 250 (1975). The Rhode Island Supreme Court, too, looked to whether "even with [the Fuller] information the jury still would have convicted defendant." *Briggs III, supra* at 758.

A "different verdict" standard premised on the creation of a reasonable doubt is exactly what *Kyles* rejects. Its use here "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

**B. <u>Unreasonable Application of Federal Law</u>**

Erroneous legal standards aside, the state court proceedings cannot be countenanced here. Both the Superior Court and the Supreme Court treated the belated revelations of Ayers's history as isolated facts without consideration of the larger meaning—individual ice floes instead of tips of a single iceberg. Thus, the Superior Court termed the three newly-revealed post-verdict convictions "merely cumulative impeaching evidence" regarding a person the jury already knew to be a criminal, *Briggs II, supra* at *22, a conclusion which was endorsed by the Rhode Island Supreme Court. *Briggs III, supra* at 758-759. The Fuller jailhouse confession was seen as an event of tangential relevance which "the State may have disclosed . . . [but] had no duty to do so," *Briggs II, supra* at *19, given the context of a case where defendant had been able to "cross-examine[d] Ayers at trial in great detail about his attempts to cooperate with the state in exchange for favorable treatment." *Briggs III, supra* at 758.

These conclusions are not merely erroneous. They stem from an ongoing refusal to undertake a full examination into the unholy relationship between Timothy Ayers and the State of Rhode Island, fostered by the state's tactical manipulation of legal rules, by overt objections and by its continuing obfuscation and silence.

An evidentiary hearing will be necessary to assess the justice of this claim. But the current indicators are very strong. The state's initial discovery response regarding Ayers was limited to three discrete statements taken by various investigators, augmented by his *Memorandum of Agreement* and his BCI as of 1997. *App. J*. The state provided no broader description of Ayers's interactions with investigators beyond Detective Croce's cryptic reference to having discovered "that Ayers had worked for Pawt. narcs in the past and had been successful in that informant capacity." *App. D*. This material was not updated until the case was several weeks into trial and Ayers was nearing the witness stand. At that point, without further

explanation, the state updated his BCI to show three additional convictions occurring after 1997. *App. N*. One of these convictions was entered on September 22, 1998; another on September 30, 1999; and a third on December 12, 2000. Trial did not commence until March of 2001, and the disclosure did not come until shortly before April 10, 2001, when Ayers took the witness stand. *App. L*:76.

In cases of delayed disclosure, "the test [under *Brady*] is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." *United States v. Villarman-Oviedo,* 325 F.3d 1, 13 (1st Cir. 2003). The late disclosure here virtually precluded effective use. On trial in Newport County, Mr. Briggs's counsel had no ability to investigate how it was that Ayers was able to engineer minimal sentences during a time when he was on probation and living on sufferance of his cooperation agreement. From a BCI sheet, it was virtually impossible to tell what had happened, never mind why: to understand how the sentences ran, whether they were concurrent or consecutive, the length and bases of probations, whether the state had filed notices of probation violation, and if so, what had happened. Counsel was relegated to using the new information in the most limited way possible: to add several convictions to the list of Ayers's transgressions, a merely marginal impeachment gain.

Further, the issue under *Brady* is not simply the facial import of this information, but the use to which it could have been put if it had been timely received and developed by competent counsel. At a minimum, this information, particularly when cabined with the three additional convictions which the state revealed after trial, would have forced Ayers to make the concessions which appeared in the post-verdict hearing: that he had spoken with Detective A'Vant on numerous occasions, *App. W*:32, 38, and that A'Vant may have been instrumental in getting him

favorable treatment. *Id.* at 42. At a maximum, the defense may have succeeded in showing a level of mutual dependence between Ayers and the state which would put the lie to Ayers's claim that the only benefit he received for his testimony was his original cooperation agreement back in 1997.

Then there is the Fuller jailhouse confession. The state had a full tape-recorded statement from Ayers by October 21, 1999. Three weeks later, on December 8, 1999, the state answered discovery in *Fuller* without mentioning the Ayers statement. *State's Answer to Defendant's Motion for Discovery and Inspection* included at *App. BB*. This was so even though under R.I.Super.R.Crim.P. 16(a)(1), the state had the obligation to disclose all written summaries of a defendant's statements or confessions regardless of whether they were intended for use at trial.

Instead, Ayers's statement remained concealed for a full year and a half before it was revealed to the *Fuller* defense. *State's Supplemental Answer to Discovery* attached as *App. CC*. Then, six days after the Briggs verdict, six days after defense counsel could have done something with it, Ayers's cooperation in the *Fuller* investigation finally saw the light of day. As is often said, but rarely so effectively expressed, timing is everything.[8]

Even with the *Fuller* cooperation revealed, Ayers's role in the *Beverly* case exposed, and the disclosure of six additional convictions occurring in the interregnum between Ayers's cooperation agreement and his trial testimony, the state still fought to limit post-conviction inquiry into its relationship with Ayers.

---

[8] The record suggests the Ayers statement did not just slip the state's collective mind. As part of its *Fuller* investigation, it worked with yet another inmate, one Frank Calenda, to obtain yet another purported jailhouse confession by Fuller. The state entered into a memorandum of agreement with Mr. Calenda on March 14, 2000. *Memorandum of Agreement* attached as *App. DD*. Six days later it had filed a supplemental answer to discovery disclosing the new evidence. *State's Supplemental Answer to Discovery* attached as *App. EE*.

> Mr. White: The state's objection, Your Honor, the defendant has brought us a specific motion claiming that events related to Mr. Fuller, Mr. Beverly, form the basis of his motion, and the State submits that the hearing and the inquiry should be limited to that.
>
> *App. W*:15
>
> * * * *
>
> Mr. Cicilline: Judge, I'm attempting to show the Court that on at least two other occasions, this witness came forward with information which he claimed to have discovered in the same way that he discovered the information that he testified to at the trial of Mr. Briggs . . . . I think I'm entitled to show that, you know, he uses all kinds of resources to obtain his liberty.
>
> The Court: We went over this at trial. The objection is sustained.
>
> *Id.* at 16-17.

Notwithstanding Ayers's ultimate admission that he had met with Detective A'Vant as many as five times over the years, *App. W*:32, 38, and that A'Vant may have helped to obtain favorable treatment, *id.* at 42, the state objected to further inquiry, claiming "that any witness, including this witness, would enjoy an informant privilege that should be recognized and that the fishing expedition should cease except to the extent that it relates to Mr. Fuller and Mr. Beverly, the basis of this motion." *Id.* at 43. The objection was sustained. *Id.*

In the recent case of *Banks v. Dretke, supra,* the Supreme Court considered a similar effort by the state of Texas to frustrate inquiry into the status of one of its witnesses as an informant. The Court found *Brady* error where the jury was not told of the witness's "true role in the investigation and trial of the case." *Id.* at 702. Regarding the claim of an informant's privilege, the Court was blunt: "Nothing in *Roviaro,* or any other decision of this Court, suggests that the state can examine an informant at trial, withholding acknowledgement of his

informant status in the hope that defendant will not catch on, so will make no disclosure motion." *Id.* at 698.

The full tale of Timothy Ayers and his cooperation with the state is still to be told. But certain of the details have started to leak out. At the post-verdict hearing, Ayers continued to deny that the minimal sentences he was receiving for his ongoing criminality were unrelated to his willingness to testify at the *Briggs* trial. *App. W*:27. He claimed that his contact with prosecutors Dambruch and White was limited to the 1997 negotiation of his cooperation agreement. *Id.* at 28. He denied that he or his attorney contacted either Dambruch or White when he had problems in 1998, 1999 and 2000. *Id.* at 29-30. And, he asserted that neither of these two prosecutors had prosecuted any of his cases after the *Briggs* matter. *Id.* at 30-31. Yet, court documents show that Stephen Dambruch appeared on a motion to reduce in P2/98-382A on July 7, 1998 to secure a non-jail resolution for Mr. Ayers. Court documents attached as *App. FF*.

No one corrected Ayers's testimony. The prosecutors sat mute, except insofar as they objected to any broadening of the inquiry. When defense counsel finished his questioning, the prosecution asked no questions and offered no explanations. Their only affirmative act was to submit an affidavit from another member of the Attorney General's office, David Prior, asserting that, when he negotiated a plea in the *Beverly* case, he did so without seeking Ayers's testimony.[9] Through Mr. Prior, the state was able to claim innocence in one case while avoiding questions on all others.

---

[9] Mr. Prior struggled to remember the details of this relatively minor case which he handled years earlier. *App. W*:62-64. He could not remember why Ayers was able to receive such a lenient disposition, *id.* at 65, speculating incorrectly, as it turned out, that perhaps it was because he stepped forward immediately and acknowledged responsibility. *Id.* at 68. In fact, the records show that Ayers denied guilt in his statement to the Cranston Police and instead placed the blame on his co-defendant, Richard Beverly, who ended up receiving seven and a half years on a

This Court must hold a hearing to answer the questions posed here—a hearing preceded by discovery and the production of all the state's files involving Mr. Ayers. At this juncture, however, it is sufficient to say that decisions that premise findings of non-materiality on a hearing which was not permitted ever to reach the heart of the *Brady* issue constitute "an unreasonable application of clearly-established Federal law as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d)(1).

**C. <u>Unreasonable Determination of Fact</u>**

The state courts debunked the significance of the Fuller information by suggesting that any inaccuracies in Ayers's report to the State Police were the result of inadvertence, and moreover, inadvertence that was not known to the state until after the trial. *Briggs III, supra,* at 758 n. 12; *Briggs II, supra* at *2 n. 1. In so doing, these decisions misunderstood and/or ignored the import of James Abbott's information about his interview of Ayers. In that interview, Ayers did not merely disclaim the accuracy of his Fuller information. He conceded that he received it second-hand, that he cobbled it together from other inmates and repackaged it for sale to the authorities. Abbott was clear about this: "He told me that the statement he gave to the State Police were things he heard at the prison from other inmates . . . . He said he took that information that he heard from other inmates and made it his story and that's what he told the State Police." *App. W*:55. This testimony went virtually unimpeached, with only the most minimum of cross-examination. *Id.* at 58-60.

The Superior Court never acknowledged this basic point. In its written decision, it credited Ayers's claim that he had inadvertently delivered false information to the state police. *Briggs II, supra* at *2 n. 1. It never even mentioned Abbott's testimony. Nor did it address the

---

violation. Ayers received only a year, and was continued on his numerous probations (again). Documents attached as *App. GG*.

central point of Abbott's testimony: that, substantive accuracy aside, Ayers had conceded he was repeating second-hand prison gossip in order to secure his own release from prison.

The Supreme Court of Rhode Island went one step further afield. It downplayed the significance of the Ayers evidence by noting that the record did not show that the state was aware of Ayers's admission that his *Fuller* evidence was false until after the verdict. *Briggs III, supra* at 758 n. 12. As discussed *supra,* this resolution of the issue rests on a basic error of law: that the materiality of exculpatory evidence in the possession of the state is intertwined with the fault of the prosecutor, and therefore should be assessed exclusively from the perspective of the prosecutor as s/he is preparing the case, rather than retrospectively based upon the full import of the information once revealed to, and developed by, the defense. The actual federal rule is the exact converse.

The net result was that neither the state trial court nor the appellate court ever passed on the question of whether Ayers had misrepresented the quality of his wares in *Fuller.* Hence, the state proceedings never assessed the real value of this suppressed information under the materiality standard demanded by *Brady.*

In these circumstances, the state's argument that this Court must afford a presumption of correctness to the state court's fact-finding must fail. *See, Memorandum* at 7. As the First Circuit observed in *Norton v. Spencer,* 351 F.3d 1, 6-7 (1st Cir. 2003), a habeas court cannot give a presumption of correctness to state court fact-finding when the record shows that the state court never actually decided the point at issue.

James Abbott testified unequivocally that Timothy Ayers told him he had sold the state police second-hand information. Ayers said otherwise. This Court must resolve the issue, as the state courts did not.

**D. Other Due Process Issues**

The application for writ of habeas corpus raises additional Due Process claims, most importantly that the prosecution hid from the defense critical evidence in the form of a screw-tie purportedly found on the seat of the defendant's truck which matched screw-ties found at the murder scene. In addition, the state failed to disclose the full criminal record of a critical witness, one William Lyonnaise, whom the state used to put Mr. Briggs in possession of a weapon similar to the one used to commit the crime. State law defalcations ordinarily do not rise to the level of Due Process violations. Here, however, the petition alleges that these matters were sufficiently extreme in nature to implicate the Federal Constitution. As such, this allegation states a claim for relief under 28 U.S.C. § 2254 and may not be summarily dismissed.

## VI. THE MOTION TO DISMISS

The state's single argument in support of its motion to dismiss is that the state courts applied correct federal law, undergirded by the presumption of correctness required by 28 U.S.C. § 2254(e)(1), when they found that the *Fuller* information and the three non-disclosed Ayers convictions were immaterial. *Memorandum* at 7-9. This claim cannot succeed where the state courts deviated from the most basic requirements of *Brady* and its progeny. As outlined above, the state courts placed erroneous restrictions on the measure of exculpatory evidence, applied an incorrect standard for materiality, ignored unchallenged evidence from a credible witness that Ayers had misrepresented the quality of his *Fuller* information, and did so while truncating petitioner's efforts to obtain disclosure of the full scope of the relationship between Ayers and the State of Rhode Island.

## VII. CONCLUSION

For the reasons stated in this memorandum, and those that may appear on further litigation of this case, this Court should deny the state's motion to dismiss and order the state to

answer the petition, prefatory to holding a hearing on Mr. Briggs's claims of constitutional deprivation.

Respectfully submitted,
Chester Briggs
By his attorneys,

/s/ John A. MacFadyen, Esq.
JOHN A. MACFADYEN (#1209)
C. LEONARD O'BRIEN (#1886)
MacFadyen, Gescheidt & O'Brien
101 Dyer Street
Providence, RI 02903
401-751-5090

**CERTIFICATION**

I hereby certify that on the 25th day of May, 2007, I filed the foregoing Memorandum in Support of Objection to State of Rhode Island's Motion to Dismiss electronically and that it is available for viewing and downloading from the ECF system. Service was accomplished by transmission of the Notice of Electronic Filing generated by the ECF system to the following attorney(s) of record:

Jane M. McSoley
Assistant Attorney General
150 South Main Street
Providence, RI 02903
jmcsoley@riag.ri.gov

/s/ John A. MacFadyen, Esq.
John A. MacFadyen, Esq. (#1209)